**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1894

_____

| | | |
|---|---|---|
| John Steven Thomas Olinger, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| Dennis J. Larson; City of Sioux | * | of South Dakota. |
| Falls; Terry Satterlee, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: November 20, 1997
Filed: January 28, 1998

_____

Before BEAM, HEANEY and BRIGHT, Circuit Judges.

_____

BRIGHT, Circuit Judge.

John Olinger filed this civil rights action against the arresting officer and the chief of police of the Sioux Falls Police Department, as well as the City of Sioux Falls, claiming the defendants violated his civil rights by arresting and detaining him without probable cause as an alleged bank robber and by failing to immediately investigate certain exculpatory leads before authorities announced Olinger's arrest to the media. The district court dismissed Olinger's entire action based upon a finding of qualified immunity for the arresting and supervising officers. Olinger timely appealed. We affirm.

## I.    BACKGROUND

We reiterate a portion of the undisputed factual background as stated in the district court's opinion.  On Saturday, May 14, 1994, an unidentified male entered the First Bank of South Dakota branch in Sioux Falls, South Dakota, approached bank teller Loreli Allen, told her he had a gun and demanded money.  After Allen handed the robber $258.00, the robber exited the bank.

Several city police officers, along with an F.B.I. special agent arrived at the bank to investigate the robbery.  The officers determined that the robbery occurred at 11:20 a.m., on May 14, 1994.  The bank's video surveillance camera time-stamped the videotape of the incident, indicating that the robbery occurred at 11:26 a.m.  However, two days later, bank security officials determined that the bank video equipment incorrectly set the time, and that the robbery probably occurred between 11:00 and 11:10 a.m.

Allen described the robber as a white male, 5'6" to 5'9" in height, brown hair, no facial hair, slender build, 25 to 35 years of age, 145-155 pounds, wearing dark pants and a green nylon jacket.  Allen stated that the robber resembled bank customer Kevin Olinger, but maintained that she did not think it actually was Kevin Olinger.  In sharp contrast to Allen's description of the robber, the surveillance tape showed a robber with a dark moustache who was wearing a white or light-colored baseball cap and light colored pants.

Officer Severson, Officer Mattson, and Sergeant Gullickson sought to interview Kevin Olinger at his parents' home in Sioux Falls.  The officers asked Kevin Olinger to step out on the front porch to discuss the bank robbery.  As they were discussing the bank robbery, Officer Severson saw an unidentified man (later identified as John Olinger) talking on the telephone inside the house.  When the man on the telephone saw the officers, he stepped around the corner of the room out of sight.  Kevin

Olinger's father joined Kevin on the front porch, where both men became very angry and threatened to sue the officers. Shortly thereafter, the man who had been talking on the telephone left the house without speaking to anyone and drove away in his vehicle. The officers noted the license plate number because they considered the man's behavior suspicious in light of the activity taking place at the Olinger home. After interviewing Kevin, the officers eliminated Kevin as a suspect. As the officers were leaving, Kevin stated to them that he was obviously innocent because he wore glasses whereas the bank robber did not. The officers maintain that the man leaving the house was not wearing glasses and that they had never informed Kevin that the bank robber did not wear glasses.

After the three officers returned to the bank, Sergeant Gullickson viewed the videotape for the first time, and immediately concluded that the man on the tape was the man he had just seen leaving the Olinger residence. Officer Severson, who was not present when Sergeant Gullickson viewed the surveillance tape, was then asked to watch the tape. Upon viewing the tape, Officer Severson also immediately concluded that the robber was the man who left the Olinger residence. Detectives Larson and Hattervig then went to the Olinger home and questioned Kevin Olinger's mother. She informed them that the man who left the house was Kevin's brother, John Olinger (hereinafter "Olinger"), and that he lived in Hartford, South Dakota.

The police officers waited for Olinger to arrive at his home in Hartford. As Olinger was getting out of his vehicle, Detective Larson determined that Olinger was a "dead ringer" for the man in the bank surveillance tape and announced to Olinger that he was under arrest for the bank robbery in Sioux Falls. Olinger allowed the officers to search his vehicle without a search warrant. Upon searching the vehicle, Detective Larson looked in the bag from the Lewis Drug Store and noted that it contained blue jeans, a shirt or underwear, and a receipt. Detective Larson told the other officers concerning the bag, "Don't worry about it. Just throw it in the car. We'll look at it later."

Olinger was taken to the Public Safety Building in Sioux Falls, where he was interviewed by Detective Larson and F.B.I. Agent Miller. During the interview, Officer Simmons brought Loreli Allen, the bank teller, into the building to watch Olinger on the black and white closed-circuit television set. Allen did not recognize Olinger. At the conclusion of the interview, Detective Larson and F.B.I. Agent Miller made a "combined decision" to formally arrest Olinger and lodge him in the jail on a charge of first degree robbery, a felony under South Dakota law. The officers then conducted a criminal history check, which revealed that Olinger did not have a prior record. Detective Larson dictated his report and then went home for the weekend. Officer Simmons turned Olinger over to Minnehaha County sheriff's deputies to be booked in the Minnehaha County Jail.

At approximately 8:30 a.m. on Monday, May 16, 1994, counsel for Olinger telefaxed a letter to Police Chief Terry Satterlee and the State's Attorney Dave Nelson requesting Olinger's immediate release. The letter listed the names, addresses, and telephone numbers of witnesses who would testify that Olinger had been in Hartford between 11:00 and 11:15 a.m. on Saturday, May 14. The letter further stated that on Sunday evening, counsel for Olinger spoke with the Lewis Drug Store manager in person and looked at the original gift certificate and check Olinger had presented. Both were date stamped Saturday, May 14 at 11:30 a.m. The letter urged the police to contact the store manager, who also had in his possession the backup cash register tape showing the purchase was made at 11:30 a.m. In light of weekend press reports that the police department intended to announce at noon on Monday the name of the person arrested for the bank robbery, the letter also asked the police chief and the prosecutor to keep Olinger's identity secret until Olinger could be exonerated and released.

Upon receiving the telefaxed letter, Chief Satterlee contacted Captain Hoier, the Chief of Detectives, and advised him to call the state's attorney and make him aware of the information in the letter. Chief Satterlee also briefly asked Captain Hoier about

the bank robbery investigation.  Between receiving the letter at 8:30 a.m. and Olinger's arraignment at 1:30 p.m., neither Chief Satterlee nor Detective Larson investigated any of the leads contained in the letter.  The Minnehaha County State's Attorney's office filed a complaint against Olinger.  At 1:30 p.m. that day, Olinger was brought before a state magistrate judge.  The magistrate judge released Olinger upon a personal recognizance bond.

On May 18, during a search of Olinger's vehicle, authorities found a plastic bag containing blue jeans, underwear, socks, and a receipt for the items from Lewis Drug, dated May 14, 1994, at 11:30 a.m.  On May 19, the State's Attorney dismissed the complaint against Olinger for insufficient evidence to indict and because the United States Attorney's office would handle any prosecution.  There, of course, has been no federal prosecution of Olinger.

Olinger filed this § 1983 action, claiming that Detective Larson, Chief Satterlee and the City were responsible for a violation of his constitutional rights.  The district court initially entered an order granting in part defendants' motion for summary judgment based upon qualified immunity.  The district court, however, denied defendants' motion for summary judgment with respect to Olinger's claim that Chief Satterlee failed to train or supervise Detective Larson and Olinger's claim against the City.  Subsequently, the district court vacated the previous order and entered a new order granting defendants' motion for summary judgment on all of Olinger's claims.

## II.    DISCUSSION

We review de novo the district court's decision to grant a summary judgment motion.  Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir.), cert. denied, 117 S. Ct. 179 (1996) (citation omitted).  "We will affirm the judgment if the record shows that there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law."  Id. (citation omitted).

## A.    Detective Larson

With respect to Detective Larson's arrest of Olinger in Hartford, Olinger claims that Detective Larson violated Olinger's clearly-established constitutional right to be free from a warrantless arrest without probable cause.  See Hannah v. City of Overland, 795 F.2d 1385, 1389 (8th Cir. 1986) (recognizing that a warrantless arrest without probable cause will give rise to a § 1983 claim).  A police officer may lawfully arrest an individual for a felony without a warrant if the officer has probable cause.  Beck v. Ohio, 379 U.S. 89, 91 (1964); Ripson v. Alles, 21 F.3d 805, 807-808 (8th Cir. 1994). An officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.  See Ripson, 21 F.3d at 808.

We conclude that Detective Larson had probable cause on May 14, 1994 to make the initial arrest of Olinger for the bank robbery.  In addition to the notable physical similarity between Olinger and the robber on the surveillance tape,[1] Detective Larson and the other officers believed that Olinger had acted suspiciously during the officers' visit to his parents' home.[2]  Furthermore, Kevin Olinger volunteered to police

---

[1]Two of the officers who saw John Olinger at his parents' home in Sioux Falls immediately concluded that Olinger was the man on the surveillance tape.  In addition, after viewing the surveillance tape twelve times, Detective Larson concluded that Olinger was a "dead ringer" for the man on the surveillance tape.

We too, in reviewing the record, have compared Olinger's photo with the surveillance tape and have observed remarkable similarities.

[2]Olinger left the house without saying a word to anyone despite the fact that two police detectives were in a heated exchange with Olinger's brother and father, during which the detectives were suggesting Olinger's brother had committed the bank robbery, Olinger's father was threatening to sue the officers, and Olinger's mother was crying.  Olinger since has proffered a plausible explanation for his suspicious behavior. However, at the time of the initial arrest, the officers were not aware of that

officers that the bank robber did not wear glasses, and the officers noticed that the man who left Olinger's home did not wear glasses. Finally, Officer Gullickson informed Detective Larson that the man leaving the Olinger home was wearing a white hat, which was consistent with the robber on the surveillance tape.

Olinger next argues that even if Detective Larson had probable cause for the initial arrest in Hartford, the information he provided to Larson, along with the bank teller's inability to positively identify Olinger as the robber vitiated whatever probable cause that may have previously existed. Furthermore, Olinger in essence argues that he had a clearly-established constitutional right to have Detective Larson investigate Olinger's alibi assertions before lodging him in the county jail.

We note that the exculpatory information at the time of Olinger's detention was neither well-developed nor compelling. Specifically, at his deposition, Olinger conceded that during his interview he never gave the police the specific time frame in which he had been in Hartford. Furthermore, Olinger did not realize that he had in his car a time-stamped receipt indicating he was at the Lewis Drug Store at 11:30 a.m. Finally, Allen's inability to identify Olinger did not compel exoneration of Olinger because Allen had described the robber differently than the robber's appearance on the surveillance tape.

In the present case, Olinger was arrested on Saturday, May 14, 1994, at 1:30 p.m. Olinger was presented to the state magistrate judge on Monday, May 16, 1994 at 1:30 p.m. This complies with the requirement that an individual arrested without a warrant be brought promptly before a magistrate judge for a probable cause hearing. Gerstein v. Pugh, 420 U.S. 103, 124-25 (1975); County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991) (stating that a judicial hearing "within 48 hours of arrest will, as a general matter, comply with the promptness requirement" of the fourth

explanation.

-7-

amendment); see Brodnicki, 75 F.3d at 1264 (recognizing that a police officer need not investigate a suspect's alibi and "conduct a mini-trial before arresting [the suspect]"); Thompson v. Olson, 798 F.2d 552, 556 (1st Cir. 1986) (providing that "following a legal warrantless arrest based on probable cause, an affirmative duty to release arises only if the arresting officer ascertains beyond a reasonable doubt that the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded").

**B.    Chief Satterlee**

Our conclusions that Detective Larson lawfully arrested Olinger in Hartford and detained him in the county jail moots Olinger's claims based upon the theory that Chief Satterlee inadequately trained or supervised Detective Larson. No amount of training or supervision would have prevented Detective Larson from making his decisions to arrest and to detain Olinger based upon probable cause. See Kohl v. Casson, 5 F.3d 1141, 1148 (8th Cir. 1993) ("No amount of training could have prevented [the officers] from doing exactly what they did here, which was to act reasonably on the information available to them").

Olinger also claims that Chief Satterlee can be held liable under § 1983 because Chief Satterlee directly participated in causing Olinger's constitutional deprivation. See Tilson v. Forrest City Police Dept., 28 F.3d 802, 806 (8th Cir. 1994). Specifically, Olinger states that despite having received the telefaxed letter outlining Olinger's alibi evidence, Chief Satterlee failed to immediately order an investigation into Olinger's alibi before releasing Olinger's name to the public later that day.

As with Detective Larson, Chief Satterlee had no obligation to immediately investigate Olinger's asserted alibi evidence prior to the probable cause hearing scheduled later that afternoon. Olinger concedes that the City's policy provides that once the police lodge a suspect in the county jail, that suspect can only be released with the consent of the state's attorney or the court. With respect to investigating the letter,

Chief Satterlee delegated responsibility to qualified subordinates to continue the investigation. Such conduct cannot be said to be oppressive or unconstitutional toward Olinger. With respect to the press release, Olinger does not have a due process claim for the publication of his name as an arrested suspect. See Paul v. Davis, 424 U.S. 693, 712 (1976) (holding that injury to reputation is neither a liberty nor property interest guaranteed against state deprivation without due process).

It is regrettable that upon receiving the telefaxed letter from Olinger's counsel, Chief Satterlee did not react in a more hands-on manner, including at least a cursory investigation of Olinger's asserted alibi and personally contacting the state's attorney to ensure that an innocent man would not be publicly accused of committing a serious crime. Nevertheless, given the numerous identifications of Olinger by police officers and the lack of time before the magistrate judge's hearing, we conclude that Chief Satterlee's actions, while arguably insensitive, did not violate Olinger's right to due process.

## C.    The City of Sioux Falls

In light of our rulings that Detective Larson and Chief Satterlee did not violate Olinger's fourth amendment rights, Olinger's claims against the City based on its alleged inadequate training and supervision of Detective Larson and Chief Satterlee,  must also fail. See Abbott v. City of Crocker, 30 F.3d 994, 998 (8th Cir. 1994) ("The City cannot be liable . . . whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim"). Olinger also challenges the constitutionality of the City's policy that once a person has been arrested and jailed, the City cannot release that person without the agreement of the state's attorney. We reject this argument and conclude that the City's policy to transfer jurisdiction to the county after the City has formally placed the suspect in jail is constitutional, as long as that the suspect receives a prompt judicial determination of probable cause, pursuant to Gerstein, which Olinger received in this case.

## III.  CONCLUSION

For the reasons stated above, we affirm the district court's ruling which granted summary judgment of dismissal of the action against Detective Larson, Chief Satterlee, and the City.

We add this comment.  While it may be regrettable that Olinger's right to be free of criminal charges received vindication later, rather than sooner, it happens to be a fact of life that sometimes police officers arrest an innocent person.  The words of the United States Supreme Court in <u>Baker v. McCollan</u>, 443 U.S. 137, 145 (1979), seem appropriate here:

> The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted--indeed, for every suspect released.  Nor are the manifold procedural protections afforded criminal defendants under the Bill of Rights "without limits."  <u>Patterson v. New York</u>, 432 U.S. 197, 208 (1977).  "Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person."  <u>Ibid</u>.

**HEANEY**, Circuit Judge, concurs in the result.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.