# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3031

_____

| | | |
|---|---|---|
| Jeffrey Tokar, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Michael Bowersox, | * | |
| | * | |
| Appellee. | * | |
| | * | |
| | * | |

_____

Submitted: September 13, 1999

Filed: December 8, 1999

_____

Before RICHARD S. ARNOLD, BEAM, and HANSEN, Circuit Judges.

_____

BEAM, Circuit Judge.

Jeffrey Tokar was convicted in Missouri state court for the murder of Johnny Douglass and was sentenced to death. Tokar appeals from the district court's[1] denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We affirm.

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri, presiding.

## I.    BACKGROUND

On the afternoon of March 11, 1992, Jeffrey Tokar, driving a yellow Subaru station wagon, picked up his girlfriend, Sandra Stickley, from her place of employment at the Budgetel Inn in Columbia, Missouri.  They went driving in a rural area outside the city limits of Centralia, Missouri, looking for vacant houses to burglarize. Tokar stopped at the residence of Linda Benoit and asked Benoit for directions to a neighbor's residence.  He told Benoit that he was planning to buy a car for his girlfriend from the neighbor.  Shortly after leaving Benoit's home, Tokar and Stickley stopped at the Douglass home located two and a half miles away.[2]

After parking his car in the Douglass driveway, Tokar knocked on the front door but received no answer.  He then went inside the house through an open garage door. After a few minutes, Tokar opened the front door and motioned for Stickley to come in.  Stickley testified that Tokar had a shotgun and was holding a shell in his mouth. Tokar and Stickley then proceeded to ransack the house and stuff various items into empty pillowcases.

Eight-year-old Jarad Douglass, four-year-old Lynzie Douglass and their father, Johnny Douglass, returned to their home while the burglary was in progress.  They had been checking on cattle in a nearby pasture.  Upon arriving back at their house, they noticed the yellow station wagon in the driveway. Johnny Douglass told his children to stay in the truck and went to investigate.  At some point, however, both children left the truck to follow their father.  In the garage, Johnny Douglass was met by Tokar, armed with a loaded shotgun.  Although Stickley did not witness the shooting, she testified that  she heard Jarad say "Mister, please don't hurt my daddy"  and  Johnny Douglass, himself, plead: "Mister, please don't hurt me.  I'll do anything you say."  She

_____

[2]The Douglass home is located in Audrain County, just a few miles northeast of Centralia, Missouri, which is in adjacent Boone County.

further testified that Tokar told Johnny Douglass not to look at him and afterwards heard one shot and then a second shot. Jarad testified that during this time, his sister Lynzie was holding her father's hand and crying and screaming. After the shooting, both Tokar and Stickley sped away in the yellow station wagon. Tokar stopped to throw the shotgun and a spent shell in a nearby farm pond. Meanwhile, Jarad ran next door to neighbor Eva Yager's house for help.

When the police arrived at the scene they found Johnny Douglass lying on the garage floor in a pool of blood, with one gunshot wound to his left cheek and one to the back of his head. The interior of the Douglass home was ransacked. Drawers had been pulled out, electronic equipment was piled on a table, and pillowcases were stuffed with items including clothing and toiletries.

Sheriff Stuart Miller of Audrain County requested the Mid-Missouri Major Case Squad be assembled to work on the case.[3] That evening, Officer McPike interviewed Jarad, Jarad's grandmother, Rebadell Douglass, and Eva Yager to get information about the suspect to disseminate to area law enforcement. From this interview, McPike obtained a description of the suspect as a white male with a yellowish mustache wearing a tan jacket, blue jeans, and a black billed cap. He was also told that the suspect was fairly tall and slender, weighing between 160 and 170 pounds. Furthermore, McPike was told that the suspect had been driving an older yellow station

---

[3]The Squad consists of a group of police officers assembled from several counties in the area to work on a major crime.

wagon.[4]   This information was immediately dispatched over the radio to police headquarters.

Later that night, Sheriff Miller received information from the sheriff's department of neighboring Boone County that pointed to Tokar as a possible suspect.  In searching their computer records for former prisoners who drove yellow station wagons, Boone County authorities had come up with the names of three suspects.  Two of these were still in the Missouri Department of Corrections.  However, the third suspect, Tokar, had been released from prison five days earlier, where he had been serving time for receiving stolen property from residential burglaries.  Boone County records confirmed that Tokar drove a yellow Subaru station wagon bearing a Missouri license plate issued to his mother, Nora Burgan, at a Centralia address.  Sheriff Miller also received information that Tokar preferred to burglarize earth contact homes and that in past burglaries had stolen items such as toiletries and clothing.

As a part of the investigation, Linda Benoit was interviewed by officers on the night of the murder and the next day.  In statements given to the officers, she indicated that sometime between 5:25 and 5:45 p.m. on the night of the murder, a man with blond hair, approximately 5'8" or 5'9" in height and weighing about 155 pounds, had come to her house asking for directions.  She told the officers that the man had acted strange, going first to her front door and then to her back door.  She further informed them that the man had left driving down Route C in the direction of the Douglass home, in either a tan or yellow car.

---

[4]Yager testified that she had seen the yellow station wagon in the Douglass driveway when she came home  that evening.  Rebadell Douglass testified that on her way home from work that day she had seen a man matching Tokar's description standing beside a yellow station wagon in the middle of the road that leads to her house and that after a few minutes he had gotten back in the car and driven away.

-4-

In a separate incident, four days before the Douglass murder and the day after Tokar had been released from prison, Daniel Miller, a farmer in Audrain County, had helped Tokar pull a yellow station wagon from a ditch. Tokar had been accompanied by Stickley. At first, Tokar told Miller that his name was "John Johnson." After Miller asked Tokar whether he was driving without a license, Tokar showed Miller his license renewal slip which listed Tokar's real name, date of birth, and social security number. Miller, a former part-time police officer and the father of Sheriff Miller, wrote down this information as well as the vehicle's make and license number. When Miller learned that the police were searching for a yellow station wagon in connection with the Douglass murder, he notified Sheriff Miller on March 12, the day after the murder, of the earlier incident. When Miller went to the station later that day to give a statement, he identified Tokar from a photograph posted in the police station.

Tokar was arrested outside his grandmother's house in Columbia on the morning of March 13, less than thirty-six hours after the Douglass murder. Sandra Stickley, who had been living with Tokar at his grandmother's residence, was also arrested. At first, Stickley denied knowing about the murder, but later confessed to being with Tokar during the incident. She entered into a plea agreement with the government and was given a twenty-year sentence for murder in the second degree.

At Tokar's trial, the State called many witnesses to establish Tokar's guilt. Jarad Douglass, the victim's son, testified that he witnessed Tokar pointing the gun at his father while his sister Lynzie held her father's hand. He testified that he heard the gun shots and ran to Yager's house for help. Sandra Stickley testified that after Tokar picked her up from the Budgetel Inn, they drank beer and smoked cocaine while they drove around in the countryside. She testified that she helped Tokar burglarize the Douglass residence. She also testified, as indicated, that she heard Johnny Douglass and his children plead for his life and heard Tokar tell Douglass "don't look at me" before he shot him. Finally, she testified that the evening of the murder, Tokar told her that he had killed Johnny Douglass by shooting him twice and further stated that he

"should have killed the kids so no one could testify and say that we were there." A medical examiner testified, consistent with Stickley's testimony, that Douglass died as a result of two gunshot wounds to the head. Based upon information provided by Stickley, the police recovered a .410 single-shot shotgun and spent shell from a nearby pond. The serial number on the gun found in the pond matched that of a gun owned by Johnny Douglass. Finally, there was also testimony from a forensic expert that the shell found in the pond as well as a shell found at the Douglass residence had markings which established that they had been fired from the Douglass gun.

A jury convicted Tokar of first degree murder in May 1993, after three hours of deliberation. After evidence presented during the penalty phase, the jury imposed the death sentence. The trial court denied Tokar's motion for a new trial and entered a sentence of death. Tokar then filed a *pro se* motion for post-conviction relief under Missouri Supreme Court Rule 29.15. With assistance of counsel, Tokar filed an amended motion and request for an evidentiary hearing. A hearing was held and the trial court subsequently denied Tokar's motion for post-conviction relief. The Missouri Supreme Court affirmed Tokar's conviction, sentence, and the denial of post-conviction relief. See State v. Tokar, 918 S.W.2d 753 (Mo. 1996) (en banc). Tokar then filed for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. The district court denied his habeas petition, but issued a certificate of appealability on four grounds. See Tokar v. Bowersox, 1 F. Supp.2d 986 (E.D. Mo. 1998). This court granted a certificate of appealability on five additional grounds.

## II.    DISCUSSION

We review the district court's findings of fact for clear error and its conclusions of law de novo. See Richardson v. Bowersox, 188 F.3d 973, 977 (8th Cir. 1999). We apply a presumption of correctness to the state court's findings of fact. See id.; 28 U.S.C. § 2254(e)(1). We will grant the petition only if the state court's adjudication of the claims resulted in a decision that was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A state court's decision is contrary to clearly established law "if the controlling case law requires a different outcome either because of factual similarity to the state case or because general federal rules require a particular result in a particular case." Richardson, 188 F.3d at 977-78. Under the "unreasonable application" prong, a federal habeas court should not grant the petition "unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Id. at 978.[5]

### Ground One:  Ineffective Assistance of Counsel

Tokar first argues that he was denied effective assistance of counsel at trial on several issues. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on his ineffective assistance of counsel claims, Tokar must establish that: (1) counsel's performance was deficient and (2) that he was prejudiced by the deficient performance. See Dodd v. Nix, 48 F.3d 1071, 1073 (8th Cir. 1995). Counsel's performance was deficient if it fell "'outside the wide range of professionally competent assistance.'" Id. (quoting Strickland, 466 U.S. at 690). Counsel's performance was prejudicial if "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. (quoting Strickland, 466 U.S. at 694). An ineffective assistance of counsel claim presents a mixed question of law and fact. See id. We review the district court's factual findings for clear error, and its legal conclusions *de novo*. See id.

---

[5]We note that the issue of the proper scope of federal court review of state court decisions under this language is currently being considered by the Supreme Court. See Williams v. Taylor, 163 F.3d 860 (4th Cir. 1998), cert. granted, 119 S.Ct. 1355 (April 5, 1999).

**A. Probable Cause**

Tokar first asserts ineffective assistance of counsel based on his counsel's failure to move to suppress evidence obtained as the result of his unlawful arrest. Tokar claims that his arrest was unlawful because it violated the Fourth Amendment in that: (1) the application for his arrest warrant was not supported by any statement of facts constituting probable cause; (2) there was no probable cause in fact to support a warrantless arrest; and (3) even if there was probable cause in fact, the arrest was still unlawful because the police lured him outside of his grandmother's house by claiming they had a valid warrant for his arrest. Tokar contends that as a result of his unlawful arrest the police were led to Stickley, and that consequently any statements and testimony obtained from Stickley should have been suppressed as fruit of the poisonous tree.

In assessing the merits of Tokar's ineffective assistance of counsel claim we keep in mind that the standard is whether, but for counsel's errors, there is a reasonable probability that the trial court would have granted the motion to suppress.

First, Tokar argues that the arrest warrant was invalid because it was issued only upon a complaint containing the conclusory statement of the prosecutor that Tokar had committed the offense rather than a written affidavit of probable cause as required under Missouri law.[6] The district court agreed that the complaint was not supported by an affidavit of probable cause and that there was no evidence in the record showing that the prosecutor had orally related facts to support the complaint. However, the court concluded that even if Tokar had shown the arrest warrant was invalid for this

---

[6]Missouri Supreme Court Rule 22.03 provides in relevant part that "[u]pon the filing of a complaint and a finding by the court that sufficient facts have been stated therein to show probable cause that a felony has been committed by the defendant . . . a warrant for the arrest of the defendant shall be issued."

reason, he had suffered no prejudice from counsel's failure to move to suppress because Stickley would have been inevitably discovered. The district court later added another rationale for its finding in its order denying Tokar's motion to alter or amend or set aside the judgment stating: "[i]n retrospect, the Court believes that no warrant may have been required at all because there was ample probable cause to support a warrantless arrest."

We find Tokar's claim regarding the lack of a probable cause affidavit is procedurally barred because Tokar never presented this argument to the state court. See Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc) (before a state prisoner is entitled to federal habeas corpus relief, he must first exhaust his state remedies and present the habeas claim to the state court); Sloan v. Delo, 54 F.3d 1371, 1381 (8th Cir. 1995) ("If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default.")[7] Tokar does not claim that he can demonstrate cause and prejudice for the default or that failure to consider the claim would result in a fundamental miscarriage of justice. See Abdullah 75 F.3d at 411. Furthermore, even if we were to reach the merits of this claim, we would find that the lack of a probable cause affidavit would not render Tokar's arrest invalid under Missouri law as long there was probable cause in fact to support the arrest. See State v. Adams, 791 S.W. 2d 873, 876-78 (Mo. Ct. App. 1990). As discussed later, we find ample probable cause in fact to support Tokar's arrest. We thus conclude that even if trial counsel was deficient in failing to file a suppression motion on the grounds that the warrant application lacked a probable

---

[7]Tokar argues that this claim is not procedurally barred because he raised it in both his motion for rehearing and a motion to recall the mandate. We disagree. See Diamond v. Wyrick, 757 F.2d 192, 193 (8th Cir. 1985) (noting that under Missouri law the sole purpose of a motion for rehearing is to draw attention to material matters of law or fact overlooked or misinterpreted by the court); Jolly v. Gammon, 28 F.3d 51, 54 (8th Cir. 1994) (motion to recall the mandate is not the appropriate vehicle to raise a claim of ineffective assistance of trial counsel).

cause affidavit, it would be impossible for Tokar to demonstrate prejudice under Strickland. See Strickland, 466 U.S. at 697 (noting that if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed).

Tokar next argues that his counsel was ineffective for failing to file a suppression motion on the ground that there was no probable cause in fact to arrest him.[8] The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense. See United States v. Everroad, 704 F.2d 403, 405-06 (8th Cir. 1983). Probable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity. See id. at 406. "The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances." Id.

The Missouri Supreme Court rejected Tokar's claim. It found that:

---

[8]We note that in Tokar's 29.15 motion for post-conviction relief, the probable cause challenge was directed at his counsel's failure to challenge the *veracity* of the facts supporting the basis for his arrest warrant. It is only in his 29.15 appeal to the Missouri Supreme Court that Tokar first raises any argument regarding his counsel's failure to challenge the arrest based on the *sufficiency* of the facts constituting probable cause. Nevertheless, even if Tokar's failure to raise this specific issue in his 29.15 motion constitutes procedural default under Missouri law, the fact that the Missouri Supreme Court addressed the issue permits federal habeas review. See Shaddy v. Clarke, 890 F.2d 1016, 1018 (8th Cir. 1989) (if a state court ignores a potential procedural bar and reaches the merits of a prisoner's claim, the federal habeas courts may consider the claim).

-10-

Witnesses identified a yellow station wagon as the vehicle in which the murderer of Johnny Douglass used to go to and from the victim's home. They also claimed the suspect was with a white female. The sheriff's office knew Tokar had been stuck in a ditch with a white female in a yellow station wagon near Centralia only days before the murder. Douglass was killed in the course of a burglary and Tokar had prior arrests for burglary and assault. Additional information existed that Tokar preferred to burglarize earth contact homes and to pack items into pillowcases. Both of these factors were also present in the Douglass home burglary. All of these circumstances demonstrate there was probable cause to arrest Tokar. Because there was probable cause to arrest Tokar, there is no ineffective assistance of counsel for not objecting to the arrest warrant.

State v. Tokar, 918 S.W.2d at 767. We presume these factual findings by the Missouri Supreme Court to be correct. See 28 U.S.C. § 2254. Tokar bears the burden of rebutting this presumption by clear and convincing evidence to the contrary. See id.

Tokar argues that the Missouri Supreme Court's finding that the police knew before his arrest about Tokar's propensity to burglarize earth contact homes and to use pillowcases is clearly erroneous. He asserts that although this information was included in a report made by Sheriff Miller, the report itself was not compiled until several days after the arrest and it does not indicate when the police were aware of these additional facts. We disagree.

Although Sheriff Miller's report was not written until March 19, six days after Tokar's arrest, it clearly indicates that the police were aware of all the facts stated in the report prior to Tokar's arrest. The opening line of Sheriff Miller's report states: "*The night of the homicide of John P. Douglass, Jr., our prime suspect became Jeffrey L. Tokar. I will describe the events leading to Tokar becoming our suspect.*" The report then catalogs the facts that Sheriff Miller relied upon, including the information

-11-

about Tokar's peculiar or distinctive *modus operandi*. Tokar argues that Sheriff Miller testified at the 29.15 hearing that the report "had nothing to do with [Tokar's] arrest." He infers from this testimony that Miller essentially stated that he did not rely on the facts in the report to make the arrest. We can draw no such inference.

Our examination of Sheriff Miller's testimony at the 29.15 hearing shows that Sheriff Miller stated nothing more than that he did not rely on the *written* report to support Tokar's arrest. Nowhere in his testimony does he disavow the facts underlying the report. Of course the report could have had nothing to do with the arrest because Sheriff Miller did not prepare it until after the arrest. This does not mean, however, that the sheriff's department did not have knowledge of the facts that were stated in the report before they were put down on paper, and more importantly, before Tokar was arrested. Furthermore, Sheriff Miller testified at the 29.15 hearing that all the information he filed regarding the Douglass homicide was truthful. Given the clear statement in the report regarding the timing of the sheriff department's knowledge of the facts set forth in the report, coupled with Sheriff Miller's sworn testimony, and finally Tokar's failure to present any other evidence showing that Miller was not aware of such facts at the time of Tokar's arrest, we find that Tokar has failed to show by clear and convincing evidence that the factual findings of the Missouri Supreme Court regarding probable cause are incorrect.

Our review of the record bolsters a finding of probable cause. The record shows the following information was known to the police prior to the arrest: (1) Police had information from McPike's interview with Jarad, Rebadell Douglass, and Eva Yager that the suspect was a slender white male with blond hair, driving a yellow station wagon. Tokar is a 5'7" white male with blond hair and weighs 145 pounds; (2) The police also knew, from interviewing Linda Benoit, that a short time before the murder, a white male with blond hair, 5'8" or 5'9" in height and weighing about 155 pounds, driving a yellow car, had stopped at her house, "acting strange" and asking for directions; (3) Daniel Miller, Sheriff Miller's father, had helped a man, whom he later

identified as Tokar, pull a yellow station wagon from a ditch near Centralia a few days prior to the murder and Tokar had at first given him a false name; (4) Boone County authorities had informed Sheriff Miller's office that Tokar had just been released from prison for receiving stolen property from residential burglaries, that he had a prior arrest record for burglary, and that he drove a yellow station wagon registered to his mother who lived in Centralia; (5) The police also knew that Tokar liked to burglarize earth contact homes. The Douglass residence was an earth contact home; and (6) The items found bagged in the Douglass home included clothing and toiletries. Sheriff Miller's office had information that Tokar had stolen similar types of items in previous burglaries.[9] Because, we find that there was sufficient probable cause in fact to arrest, Tokar was not prejudiced by counsel's failure to move to suppress.

Finally, Tokar contends that his counsel should have moved to suppress on the ground that even if there was probable cause, the arrest was still unlawful because the arresting officers lured him outside of his grandmother's house by claiming they had a valid warrant for his arrest when this was not the case. We find this claim is procedurally barred. Tokar never raised this particular ineffective assistance claim in either his 29.15 motion or in the appeal of the 29.15 ruling to the Missouri Supreme Court. See Lowe-Bey v. Groose, 28 F.3d 816, 819 (8th Cir. 1994) (noting that in Missouri, ineffective assistance of trial counsel claims may only be raised in a Rule

---

[9]Sheriff Miller's report does not mention anything regarding Tokar's use of pillowcases during burglaries. Nor is there any testimony from trial as to precisely when officers became aware of this particular piece of information. However, even if this factual finding by the Missouri Supreme Court was incorrect, we find that there was ample probable cause, including information regarding other aspects of Tokar's *modus operandi*, i.e., the propensity to burglarize earth contact homes and to steal toiletries and clothing, to support the arrest.

-13-

29.15 proceeding.)  Tokar has not asserted any cause and prejudice for the default, and therefore, we do not address this claim.  See id. at 818.[10]

Because we uphold the district court's decision on the basis of probable cause, we need not reach the issue of whether the district court erred in finding that Stickley would have been inevitably discovered or whether the case should be remanded for an evidentiary hearing on that issue.

## B.  Remaining Ineffective Assistance of Counsel Claims

Tokar raises several other ineffective assistance of counsel claims on which we granted a certificate of appealability.  However, in his brief on appeal, he raises  and discusses only one of these issues.  Consequently, we find the Tokar has abandoned the rest of his ineffective assistance of counsel claims.  See Hatley v. Lockhart  990 F.2d 1070, 1073 (8th Cir. 1993).[11]  The ineffective assistance of counsel claim raised and discussed by Tokar in his brief deals with his counsel's failure to investigate and present evidence that the testimony of the state's witnesses was inconsistent with his presence at the murder scene at the time of the offense.

The district court found this claim to be procedurally defaulted.  Tokar concedes that although he raised this claim in his  29.15 petition, he did not appeal the denial of the claim to the Missouri Supreme Court.  Under this scenario, the claim would be

---

[10]Tokar further argues that the district court erred in its alternative finding that his grandmother's consent to search the house, leading to the discovery of Stickley, obviated the need for an arrest warrant.  He contends that his grandmother's consent, if any, was based on reliance on the invalid arrest warrant.  Although, this argument is not very clear, we find the issue of the grandmother's consent  is irrelevant because the officers had a search warrant for her house. Tokar has never raised the issue of the validity of the search warrant in state court proceedings.

[11]Even if we were to reach these claims, we would find they have no merit.

-14-

considered defaulted under Missouri law. See Lowe-Bey, 28 F.3d at 818. Tokar claims that the procedural default should be excused because he raised the issue in his motion for rehearing and his motion to recall the mandate. Alternatively, he argues that his failure to raise the issue on appeal was due to ineffective assistance of appellate counsel which constitutes cause for his default. Since we find the issue can be easily resolved on the merits, we need not delve into all of Tokar's excuses for his procedural default. See Barrett v. Acevedo, 169 F.3d 1155, 1162 (8th Cir.) (en banc) ("Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated."), cert. denied, 120 S. Ct. 120 (1999).

The essence of Tokar's claim is that counsel was ineffective for failing to investigate and present evidence that would have cast doubt on his presence at the murder scene. Tokar bases this argument on an investigator's testimony at the 29.15 hearing that it would take at least seven minutes to get from Linda Benoit's home to the Douglass residence. Tokar argues that, given this time sequence, Benoit's testimony that Tokar was at her home for several minutes beginning at 5:25 p.m. and Eva Yager's testimony that she saw Tokar's car just before 5:30 were inconsistent. We disagree. However, even assuming that counsel was somehow deficient for failing to develop this issue, we find that Tokar was not prejudiced by this failure. There was overwhelming evidence against Tokar in the form of testimony by both the victim's young son and by Tokar's accomplice/girlfriend, Sandra Stickley, which clearly placed Tokar at the Douglass home at the time of the murder. Consequently we cannot say that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See Dodd, 48 F.3d at 1073.

In sum, any deficiencies in counsel's performance did not rise to the level of ineffective assistance of counsel as defined in Strickland.

### Grounds 2, 3, 4, and 5:  Penalty Phase Instructions

-15-

Tokar next claims that jury instructions given during the penalty phase of the trial violated his right to due process of law and his right to be free from cruel and unusual punishment in violation of the Fourteenth and Eighth Amendments.

First, Tokar asserts that the order in which the instructions were given improperly limited the jury's consideration of mitigating circumstances. Specifically, he argues that the instructions required the jury to decide whether aggravating circumstances warranted imposition of the death penalty before the jury could consider any mitigating circumstances. Under such an instruction scheme, Tokar argues, the jury's decision to impose the death penalty is made solely on the basis of aggravating circumstances because it is not until the jury has *already* decided that death is the appropriate punishment, that it is told that it may consider mitigating circumstances. Tokar's argument is foreclosed by our decision in Ramsey v. Bowersox, 149 F.3d 749, 757 (8th Cir. 1998), cert. denied, 119 S. Ct. 1083 (1999), where we rejected a similar attack on the Missouri sentencing instructions. Furthermore, we noted in Ramsey that the jury had been instructed that after it found the existence of an aggravating circumstance, it was still not required to impose the death penalty, even if it found no mitigating evidence. See id. Here, the jury was similarly instructed.

Second, Tokar claims that the trial court erred in refusing to instruct the jury on specific nonstatutory *mitigating* circumstances while instructing the jury on specific nonstatutory *aggravating* circumstances. Tokar claims error in the trial court's refusal to submit his proffered alternative instruction which specifically listed several nonstatutory mitigating circumstances. By instructing the jury on statutory and nonstatutory *aggravators* but only on statutory *mitigators*, Tokar asserts that the trial court minimized the effect of the nonstatutory mitigators. A state may not preclude the sentencer from considering any mitigating factor. See Richardson, 188 F.3d at 981. "It is not sufficient to allow defendants to present mitigating evidence; the sentencer 'must also be able to consider and give effect to that evidence in imposing the sentence.'" Id. (quoting Penry v. Lynaugh, 492 U.S. 302, 319 (1989)). We find that

-16-

the jury was adequately able to consider and give effect to such evidence in this case. We agree with the Missouri Supreme Court's determination that the language in the approved instruction which informed the jury that it "may also consider any circumstances which you find from the evidence in mitigation of punishment" adequately covered the jury's consideration of mitigating evidence and complied with constitutional requirements for the submission of mitigating circumstances in death penalty cases. See Lingar v. Bowersox, 176 F.3d 453, 460 (8th Cir. 1999). Furthermore, Tokar's counsel told the jury in closing argument that it could consider any mitigating circumstances whether listed in the jury instructions or not and the record shows that counsel fully argued such mitigating circumstances to the jury. See id.

Third, Tokar asserts that one of the aggravating circumstances submitted to the jury was unconstitutionally vague. In deciding whether to impose the death penalty, the jury was instructed that it had to unanimously find at least one of the two aggravating circumstances as follows:

1. Whether the murder of John P. Douglass involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the defendant killed John P. Douglass after he was bound or otherwise rendered helpless by defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life.

2. Whether the murder of John P. Douglass was committed while the defendant was engaged in the perpetration of burglary. A person commits the crime of burglary when he knowingly enters unlawfully in a building or inhabitable structure for the purpose of committing stealing.

Tokar challenges the language "outrageously and wantonly vile, horrible, and inhuman" used in the first aggravator as unconstitutionally vague. He further contends that the fact that the instruction told the jury it could only find "depravity of mind" if it found "that the defendant killed John P. Douglass after he was bound or otherwise rendered helpless by defendant" does not cure this vagueness, because the jury made no specific finding. We reject this argument. We find that the instruction provided sufficient guidance to the jury. See Ramsey, 149 F.3d at 754-55. Furthermore, Missouri is a nonweighing state, which means that only one aggravating factor need be present in order to validly impose a death sentence. See Harris v. Bowersox, 184 F.3d 744, 750 (8th Cir. 1999). Therefore, even if the first aggravator was unconstitutionally vague, the error was harmless beyond a reasonable doubt because the jury found the existence of the second statutory aggravator. See id.; Sloan, 54 F.3d at 1385-86 (in nonweighing state like Missouri, jury's finding of invalid aggravating factor does not invalidate death verdict when jury finds existence of at least one valid aggravating factor.)

Tokar's fourth and final claim is that Missouri is a weighing state and that the Missouri Supreme Court erred in holding that the death sentence could be upheld on the basis of one valid statutory aggravating factor. First, we note that Tokar does not raise or discuss this point in his brief, and thus we deem it abandoned. Even if we were to address the claim, our discussion in the foregoing paragraph reveals that it has no merit.

### Grounds 6 and 7: Prosecutor's Comments During Opening and Closing Argument

Next, Tokar claims that various comments made by the prosecutor in his opening statement at the guilt phase and in his final arguments at the guilt and penalty phases were improper and violated his right to due process and his right to be free from cruel and unusual punishment in violation of the Fourteenth and Eight Amendments. We

-18-

agree with the district court's determination that both of these grounds are procedurally defaulted because Tokar never raised either in his direct appeal to the Missouri Supreme Court.[12] Tokar claims that even if these grounds are procedurally defaulted, ineffective assistance of appellate counsel provides the requisite cause and prejudice to excuse the default. We disagree.

Ineffective assistance of appellate counsel may constitute cause and prejudice excusing a procedural default. See Boysiewick v. Schriro 179 F.3d 616, 619 (8th Cir. 1999).[13] To establish ineffective assistance of appellate counsel, Tokar must show under the familiar Strickland standard that appellate counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced his defense. See Zinzer v. Iowa, 60 F.3d 1296, 1299 (8th Cir. 1995). In order to prove such prejudice, petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See Boysiewick 179 F.3d at 620. Having carefully reviewed the record, we conclude that even if we were to assume that some of the prosecutor's comments were improper and appellate counsel was deficient in not raising them, counsel's conduct did not prejudice Tokar because there is no reasonable probability that, but for the failure to

_____

[12]Tokar argues that his claim regarding the prosecutor's comments during closing arguments is not procedurally barred because he raised in his motion for rehearing and again in his motion to recall the mandate to the Missouri Supreme Court. We disagree. See supra note 7.

[13]We note that ineffectiveness of appellate counsel may not be asserted as cause to excuse a procedural default unless the petitioner has first presented this argument as an independent Sixth Amendment claim to the state courts, if a forum existed to make the argument. See Whitmill v. Armontrout, 42 F.3d 1154, 1157 (8th Cir. 1994). Because Tokar challenged the effectiveness of his appellate counsel for failing to raise the issue of the prosecutor's comments as an independent claim in his motion to recall the mandate, the claim can now be asserted to establish cause for his procedural default. See Jolly, 28 F.3d at 53. (In Missouri, motion to recall the mandate is appropriate method to raise ineffective assistance of appellate counsel claim).

challenge these comments, Tokar would have prevailed in his direct appeal. First, as the district court noted and defendant concedes, the Missouri Supreme Court review of the comments was limited to plain error review. Second, the evidence overwhelmingly supported the jury's decision both as to guilt and sentence, and this "'reduced the likelihood that the jury's decision was influenced by the arguments.'"[14] See Snell v. Lockhart 14 F.3d 1289, 1301 (8th Cir. 1994) (quoting Darden v. Wainwright, 477 U.S. 168, 182 (1986)); cf. Shurn v. Delo, 177 F.3d 662, 667 (8th Cir.) (overturning the death sentence in light of the extensive improper comments by the prosecution, the state's admission that it could not prove that petitioner did the shooting, and the jury's disagreement on punishment), cert. denied, sub nom. Shurn v. Bowersox, 1999 WL 813753 (1999).

In the absence of Strickland prejudice, Tokar cannot establish ineffective assistance of appellate counsel and therefore, cannot show "cause" for the procedural default of his underlying claims. See Zinzer, 60 F.3d at 1299. Thus, Tokar cannot overcome the procedural bar and we need not consider the "prejudice" component of the "cause and prejudice" analysis. See id.

---

[14]The district court observed in its opinion:

> In this case, the state produced compelling evidence of the defendant's guilt. Petitioner's accomplice testified against him at trial, and the jury reached a verdict of guilty in just over three hours. In the penalty phase, the jury had to find the existence of at least one of the two aggravating circumstances listed in the instructions. The jury unanimously found both beyond a reasonable doubt. The jury then went on to find the existence of all eight of the aggravating circumstances (concerning previous offenses committed by petitioner) listed in Instruction 20. The jury returned its verdict assessing petitioner's punishment at death in a little over two hours.

Tokar v. Bowersox, 1 F. Supp.2d at 998-99.

**Ground 8: Proportionality Review**

Tokar asserts that the Missouri Supreme Court's review of the proportionality of his sentence violated his right to due process and his right to be free from cruel and unusual punishment in violation of the Fourteenth and Eighth Amendments. The Missouri legislature mandates such a review of all cases where the death sentence is imposed in Missouri courts. See Mo. Rev. Stat. § 565.035. While the review is not mandated by the Constitution, once in place it must be conducted consistently with the Due Process Clause. See Kilgore v. Bowersox, 124 F.3d 985, 996 (8th Cir. 1997), cert. denied, 118 S. Ct. 2352 (1998). The Missouri Supreme Court reviewed Tokar's death sentence and concluded the sentence was "not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." See State v. Tokar, 918 S.W.2d at 773. The Constitution does not require us to look behind that conclusion to consider the manner in which the Missouri Supreme Court conducted its review or whether the court misinterpreted the Missouri statute. See Six v. Delo, 94 F.3d 469, 478 (8th Cir. 1996); see also Ramsey, 149 F.3d at 754 (Missouri's proportionality review does not violate the Eighth Amendment, due process, or equal protection of the laws).

**Ground 9: Incompetence to Proceed at Trial**

Tokar's final claim is that he was incompetent to proceed at trial and as a result his conviction violates the Fifth, Sixth, Eighth, and Fourteenth Amendments. The Missouri Supreme Court conducted an exhaustive examination of the issue and found no merit to Tokar's claim. After having reviewed the record, we conclude, like the district court, that there is no reason to question the Missouri Supreme Court's decision on this issue.

-21-

## III.  CONCLUSION

For the foregoing reasons the order of the district court dismissing the petition is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.