Jeffrey E. ARMSTRONG, individually, and William Lawrence, d/b/a Native American Press/Ojibwe News, Plaintiffs,

v.

MILLE LACS COUNTY SHERIFFS DEPARTMENT; Mille Lacs County; Dennis Boser, individually and in his official capacity as Sheriff of Mille Lacs County; Mille Lacs Tribal Police Department; Mille Lacs Band of Chippewa Indians; and Marc R. Gabiger, Defendants.

Civ. No. 98–2658(RLE).

United States District Court, D. Minnesota.

Aug. 23, 2002.

974

Ronald H. Usem, Craig D. Greenberg, Huffman Usem Saboe Crawford & Greenberg, Mpls, MN, Jeffrey D. Armstrong, Bemidji, MN, William Lawrence, Native American Press/Ojibwe News, St Paul, MN, for plaintiff.

Roger Lee Rowlette, Jenell M. Matthews, Johnson & Lindberg, Mpls, MN, Joseph B. Marshall, Marshall & Assoc, Circle Pines, MN, for defendant.

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 23rd day of August, 2002.

## I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 28 U.S.C. § 636(c), upon the Motion of the Mille Lacs Tribal Police Department, Mille Lacs Band of Chippewa Indians, and Marc R. Gabiger (collectively, "the Tribal Defendants") for Summary Judgment.[1] A Hearing on the Motion was scheduled for April 11, 2002, but the parties agreed, prior to the Hearing, to submit the Motion on the Record. For purposes of this Motion, the Plaintiffs Jeffrey E. Armstrong ("Armstrong"), and William Lawrence ("Lawrence"), doing business as the Native American

Press/Ojibwe News,[2] appeared by Craig D. Greenberg, Esq., and the Tribal Defendants appeared by Joseph B. Marshall, Esq.

For reasons which follow, we grant the Tribal Defendants' Motion for Summary Judgment.

## II. *Factual and Procedural Background*

This action arises from the arrest of Armstrong, for trespassing, in violation of Minnesota Statutes Section 609.605,[3] which occurred on premises that were within the boundaries of the Mille Lacs Indian Reservation, and just outside a hotel meeting room, that had been rented by the Minnesota Chippewa Tribe ("MCT"), for the purpose of conducting a Tribal Executive Committee ("TEC") Meeting. See, *Ex. 1 to Deposition of Norman Deschampe*, attached to *Affidavit of Joseph B. Marshall* ("Ex.1"). The TEC, a twelve-member committee, is comprised of the Chairman, and the Secretary of the Treasury, of each of the six reservations of the MCT,[4] and serves as the governing body of the MCT. See, *Deposition of Norman Deschampe*, at

---

1. The Tribal Defendants' Motion for Summary Judgment, as well as the Motion of the Mille Lacs County Sheriffs Department, Mille Lacs County, and Dennis Boser ("the County Defendants"), for Summary Judgment, were previously denied, as moot, when we granted the Tribal Defendants' Motion to Stay all proceedings pending adjudication of matters of Tribal law. See, *Armstrong v. Mille Lacs County Sheriff's Dep't.*, 112 F.Supp.2d 840 (D.Minn.2000); *Docket No. 42*. The parties subsequently agreed to a lifting of the Stay, and renewed their Motions for Summary Judgment. On May 6, 2002, however, the County Defendants were dismissed from the action by stipulation of the parties, and therefore, we only consider the Tribal Defendants' renewed Motion for Summary Judgment.

2. We do not overlook the question of standing. We have serious doubt that any of the claims, which the Plaintiffs assert, are held by anyone other than Armstrong. He was arrested—not Lawrence or the Native American Press/Ojibwe News—and, by every appear-

ance, his injuries are personal to him, and not collectively held by the Plaintiffs as a group. Nevertheless, since the parties have not directly addressed the issue, we address the claims presented as those held by the Plaintiffs jointly.

3. In pertinent part, Section 609.605, Subdivision 1(b)(3), provides as follows:

 (b) A person is guilty of a misdemeanor if the person intentionally:

 * * *

 (3) trespasses on the premises of another and, without claim of right, refuses to depart from the premises on demand of the lawful possessor * * *.

4. The six reservations of the MCT consist of the Grand Portage, Leech Lake, White Earth, Fond du Lac, Mille Lacs, and Bois Forte Reservations. See, *Deposition of Norman Deschampe*, at 8, *Ex. I to Transmittal Affidavit of Graig D. Greenberg, Esq.*

8–9, *Ex. I to Transmittal Affidavit of Craig D. Greenberg, Esq.* ("Deschampe Depo."). The underlying facts are not seriously in dispute.

On October 22, 1997, the TEC scheduled a meeting in a room at the Grand Casino Mille Lacs Hotel, which is located in Garrison, Minnesota, on Reservation land. See, *Deschampe Depo.*, at 23–29. The room was reserved from 9:00 o'clock a.m., until 11:00 o'clock a.m. See, *Ex. 1.* At the time of the meeting, Norman Deschampe ("Deschampe"), who was the President of the MCT and, as President, who chaired the TEC meetings, was responsible for the day-to-day operations of the MCT. *Id.* at 7–8.

The meeting on October 22, 1997, was apparently scheduled to commence at approximately 9:00 or 10:00 o'clock a.m. The TEC Meeting Notes reflect that, prior to the start of the "regular meeting," "Norman asked that all attorneys, press and non-Indians * * * leave the meeting." *Ex. 3 to Deposition of Norman Deschampe,* attached to *Affidavit of John B. Marshall* ("Ex. 3"). Deschampe believes that it was within his authority to conduct a closed session of the MCT, because it occurred prior to the start of the "regular meeting." *Deschampe Depo.*, at 54. He could not identify any provision of the MCT Tribal Constitution, however, which provided him such authority, and he did not believe "Robert's Rules of Order," which governs Tribal Meetings, applied, since the "regular meeting" had not been called to order. *Id.* The "regular meeting" then commenced at 11:35 o'clock a.m., and concluded at 12:40 o'clock p.m. *Id.*

As already noted, at one point in the TEC proceedings, apparently prior to the "regular meeting," and as noted in the Minutes of the meeting, Deschampe requested that all attorneys, press and non-Indian persons leave the meeting, in order that the TEC could discuss matters pertaining to the settlement of a legal action, in which the MCT, and the United States Government, were then involved. See, *Deschampe Depo.*, at 42–44; *Ex. 3.* Armstrong, who is a reporter employed by the Native American Press/Ojibwe News, and who was in attendance at the TEC meeting, did not leave the meeting.

According to Armstrong, who is not a Native American, he had been dispatched by his employer to report on the meeting. *Deposition of Jeffrey D. Armstrong,* at 31–32, *Ex. H to Transmittal Affidavit of Craig D. Greenberg, Esq.* ("Armstrong Depo."). He claims that he did not hear Deschampe, or anyone else, ask all non-Indians, including reporters, to leave the room, although he does not dispute that the request was made. *Id.* at 33. He also does not recall witnessing any number of individuals leaving the room. *Id.* He does claim, though, that, prior to the commencement of the meeting, he was questioned by Deschampe as to whether he was an "Indian." *Id.* Armstrong responded that his Native American status was none of Deschampe's business, at which time, according to Armstrong, Deschampe asked him to leave the room. *Id.* at 34. Armstrong made no move to leave but, rather, said something to the effect that he was not going to voluntarily comply with the illegal request.[5] *Id.*

---

**5.** Deschampe's version of the incident is quite different from Armstrong's. According to Deschampe, after he asked all non-Indians, including reporters, to leave the room, he noticed Armstrong had not left. *Deschampe Depo.,* at 44. Armstrong's presence was brought to his attention by another member, but Deschampe did not personally know

whether Armstrong was Native American. *Id.* at 45. Deschampe then reiterated his request that all non-Indians leave the room. *Id.* at 44. Thereafter, Deschampe noticed security escorting Armstrong from the room. *Id.* Deschampe denies personally having any discussion with Armstrong, however. *Id.*

The Defendant Marc R. Gabiger ("Gabiger") is an officer with the Mille Lacs Tribal Police Department, who has worked for the department full time, since May of 1997. *Deposition of Marc R. Gabiger*, at 13–14; *Ex. F to Transmittal Affidavit of Craig D. Greenberg, Esq.* ("Gabiger Depo."). He has been POST-licensed as a police officer since that time. *Id.* at 16. He was dispatched to the TEC meeting, on October 22, 1997, in order to provide security for the meeting. *Id.* at 23–24; see also, *Ex. 2 to Deposition of Norman Deschampe*, attached to *Affidavit of John B. Marshall* ("Ex.2")("Grand Casino Mille Lacs Banquet Event Order" noting that the meeting would involve two security, and two Tribal police).

According to Gabiger, there were quite a few people "milling" around in and around the meeting room, and nobody was checking any identifications, or asking about Tribal status. *Gabiger Depo.*, at 29–30. Before the actual start of the meeting, the TEC president—Deschampe—announced that the TEC wanted to discuss some Tribal issues, so he asked all non-Indians, press and lawyers to leave the room. *Id.* at 31. Gabiger recalls a number of individuals leaving the room. *Id.* at 32.

Gabiger recalls Armstrong remaining in the room, and he watched as Deschampe approached Armstrong. *Id.* at 33. According to Gabiger, Deschampe then asked Armstrong if he was a Native American, to which Deschampe received a negative response, and then queried whether he was a reporter, although Gabiger cannot recall Armstrong's response to that question. *Id.* Gabiger then heard Deschampe ask Armstrong to leave the room, but Armstrong just remained sitting.[6] *Id.*

Thereafter, Gabiger approached Armstrong, and informed him that, if he did not immediately leave the meeting room, he would be arrested. *Id.* at 34–35; see also, *Armstrong Depo.*, at 34–35, 38. Gabiger admits that he did not know, at that point, whether Armstrong was legally entitled to be in the room, but he explains that, since Armstrong was asked to leave, Gabiger believed he did not have a right to be there. *Gabiger Depo.*, at 35, 43. According to Gabiger, to his knowledge, Deschampe was the ultimate authority for the meeting, Deschampe had asked Armstrong to leave the room, and the room had been rented by the TEC. *Id.* at 36, 54–55. Therefore, in Gabiger's opinion, based on his training and experience, Armstrong was trespassing. *Id.* at 40–41.

Once Gabiger ordered Armstrong to leave the room, and when Armstrong made no attempt to leave, Gabiger effected an arrest, and escorted Armstrong into the hotel lobby. *Id.* at 37. Gabiger did not discuss the decision to arrest Armstrong with Deschampe, or with anyone else. *Id.* at 38. Rather, Gabiger explained that it was his normal practice to arrest, rather than cite, individuals for trespass. *Id.* at 44. He further did not question whether Armstrong had a right to be in the meeting, and Gabiger did no independent investigation into whether Armstrong had a "claim of right." *Id.* at 38, 40, 54. Gabiger did not question Armstrong about his identity, or the reason for his being at the meeting. *Id.* at 40.

Armstrong voluntarily left with Gabiger, never raised his voice, and did not exhibit any hostility toward Gabiger, or anyone else. *Id.* at 37–38. When in the hotel lobby, Gabiger frisked Armstrong, and

---

**6.** According to Gabiger's report of the incident, Armstrong was asked by "several members" of the TEC to leave the room, see, *Ex. E to Transmittal Affidavit of Craig D. Greenberg,* *Esq.*, but Gabiger was only able to identify Deschampe in his deposition testimony, *Gabiger Depo.*, at 60.

handcuffed him in the presence of a number of persons, who were also in the lobby. *Id.* at 41. Armstrong was then escorted to Gabiger's squad car, and was driven thirty-four miles to the Mille Lacs County Sheriff's Department, in Milaca, Minnesota, where he was detained in the Mille Lacs County Jail on charges of trespass. *Id.* at 47. Gabiger instructed the jailer to detain Armstrong for about four hours, at which time he could be released on his own recognizance. *Id.* at 51; see also, *Ex. E to Transmittal Affidavit of Craig D. Greenberg, Esq.* ("Ex.E"). Gabiger testified that his reason for the instruction was to ensure that Armstrong would not return to the meeting and commit the same act. *Gabiger Depo.,* at 51.

Ultimately, Mille Lacs County charged Armstrong with a misdemeanor trespass. See, *Ex. E.* The charges were later dropped, on April 27, 1998, by Order of the State District Court. See, *Ex. A to Second Transmittal Affidavit of Craig D. Greenberg, Esq.* ("Ex.A"). The Court determined that it did not have subject matter jurisdiction over the case, because it decided that a key element of the trespass charge—"without a claim of right"—depended on resolution of a question of internal tribal law. *Id.* Therefore, it found that it "lack[ed] jurisdiction to resolve the internal tribal dispute that exists in this case." *Id.*

Along with his employer—Lawrence, who does business as the Native American Press/Ojibwe News—Armstrong commenced this action, alleging that, as a re-sult of his false arrest and imprisonment, he was deprived of his constitutional rights—namely, those secured to him by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution—which constitutes a violation of Title 42 U.S.C. § 1983. *Complaint,* at & & 14, 28, 30–34. The Plaintiffs specifically allege that Armstrong had a "claim of right" to be at the meeting, and that, by asking all non-Indians, press, and attorneys to leave the room, Deschampe violated the MCT Constitution, and Robert's Rules of Order.[7] As such, since Deschampe failed to comply with Robert's Rules of Order, the Plaintiffs believe that the request, by Gabiger, that Armstrong leave the room, and his subsequent arrest, were illegal. The Plaintiffs also assert a State law claim of defamation. *Id.* at 35–38.

Now, the Tribal Defendants have moved for Summary Judgment, claiming that the arrest of Armstrong, by Gabiger—which is the gravamen of the entire suit—was based on probable cause. In the alternative, they contend that Gabiger is entitled to qualified immunity on the constitutional claims. They also assert that he is entitled to official immunity on the defamation claim. The Plaintiffs' oppose the Motion.

### III. *Discussion*

*A. Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique profi-

---

**7.** Under the Bylaws of the MCT, "[s]even members of the Tribal Executive Committee shall constitute a quorum, and Robert's Rules shall govern its meetings" and, "[e]xcept as provided in said Rules, no business shall be transacted unless a quorum is present." *Revised Bylaws of the Minnesota Chippewa Tribe, Article 2, Section 5,* quoted at *Memorandum of Points and Authorities Submitted by Defendants in Support of Their Motion for Summary Judgment,* at 4. According to Lawrence, the TEC, and Deschampe in particular, violated that provision, and Robert's Rules of Order, because the meeting was closed without actually calling the meeting to order, and then voting on whether to close the meeting. *Deposition of William Joseph Lawrence,* at 45, 94–95, *Ex. B to Second Transmittal Affidavit of Craig D. Greenberg, Esq.*

ciencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, *Duffy v. McPhillips*, 276 F.3d 988, 991 (8th Cir.2002); *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir. 2002); *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 901 (8th Cir.2000); *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir.2000); *Carter v. St. Louis Univ.*, 167 F.3d 398, 400 (8th Cir.1999). For these purposes, a disputed fact is "material" if it must inevitably be resolved, and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1029 (8th Cir.2000); *Austin v. Minnesota Mining and Mfg. Co.*, 193 F.3d 992, 995 (8th Cir.1999); *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir.1998); *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir.1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also,

*Anderson v. Liberty Lobby, Inc.*, supra at 256; *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir.1999); *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999).

Moreover, the movant is entitled to Summary Judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, supra at 322, 106 S.Ct. 2548; see also, *Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 891 (8th Cir.2000); *Greer v. Shoop*, 141 F.3d 824, 826 (8th Cir.1998). No genuine issue of fact exists in such a case, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross*, 992 F.2d 162, 163 (8th Cir.1993).

**B.** *Legal Analysis.* We initially note that, for purposes of the Tribal Defendants' Motion for Summary Judgment, we are treating the Tribal Defendants as we would a municipality, in accordance with Minnesota Statutes Section 626.90, Subdivision 2, which provides express preconditions for the Mille Lacs Band's law enforcement activities. The Statute provides as follows:

(a) The band [8] has the powers of a law enforcement agency, as defined in section 626.84, subdivision 1, paragraph (h), if all of the requirements of clauses (1) to (4) are met:

---

**8.** "Band" is defined by the statute as "the federally recognized Mille Lacs Band of Chip-

pewa Indians." *Minnesota Statutes Section 626.90, subdivision 1.*

(1) the band agrees to be subject to liability for its torts and those of its officers, employees, and agents acting within the scope of their employment or duties arising out of a law enforcement agency function conferred by this section, to the same extent as a municipality under chapter 466, and the band further agrees, notwithstanding section 16C.05, subdivision 7, to waive its sovereign immunity for purposes of claims of this liability;

(2) the band files with the board of peace officer standards and training a bond or certificate of insurance for liability coverage for the maximum amounts set forth in section 466.04;

(3) the band files with the board of peace officer standards and training a certificate of insurance for liability of its law enforcement officers, employees, and agents for lawsuits under the United States Constitution; and

(4) the band agrees to be subject to section 13.82 and any other laws of the state relating to data practices of law enforcement agencies.

*Minnesota Statutes Section 626.90, subdivision 2.* If the requisites of the Statute are complied with, the Band is then "authorized to appoint peace officers * * * who have the same powers as peace officers employed by local units of government." *Minnesota Statutes Section 626.90, Subdivision 3.*

The Plaintiffs note that the Band, and the County of Mille Lacs, entered into a formal cooperative agreement, under Section 626.90, on August 7, 1991. The agreement was amended, on July 1, 1998, to read as follows:

The Mille Lacs Band of Chippewa Indians agrees to be subject to liability for its torts and those of its officers, employees, and agents acting within the scope of their employment or duties arising out of a law enforcement agency function, to the same extent as a municipality under chapter 466 of Minnesota Statutes, and the band further agrees, notwithstanding Minn.Stat. § 16B.06, Subdivision 6, to waive its sovereign immunity for the purposes of claims of this liability.

The waiver of sovereign immunity does not apply to claims brought by employees of the Band, against the Band as an employer, arising out of the employment policies or practices of the Band, including, but not limited to, claims due to demotion, selection, dismissal, and failure to promote.

*Ex. D*, at 4, attached to *Transmittal Affidavit of Craig D. Greenberg, Esq.* As a result of the designation in the Statute, we are treating, for purposes of determining the extent of their liability, if any, the Tribal Defendants as we would a municipality. See, e.g., *Armstrong v. Mille Lacs County Sheriff's Dep't*, 112 F.Supp.2d 840, 848 (D.Minn.2000)("Specifically, as we have explained, Section 626.90 provides that the Band is to be liable for its torts, to the same extent as a municipality, and that the Tribe expressly waived its sovereign immunity for such purposes."). With that caveat in mind, we turn to the Plaintiffs' constitutional claims first, and then to the State law claim of defamation.

1. *The Plaintiffs' claims under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.*

The Plaintiffs assert that the Tribal Defendants' actions which, it appears, wholly consist of the arrest by Gabiger, violated their rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments, to the United States Constitution. All of their claims flow, however, from Gabiger's alleged violation of the Fourth Amendment,

in that he assertedly arrested Armstrong without probable cause. Thus, the issue before us is whether there was probable cause for the arrest. As a consequence, we first analyze each of the Tribal Defendants' roles in this case.

a. *The Mille Lacs Band of Chippewa Indians.* As already noted, due to the provisions of Minnesota Statutes Section 626.90, we are treating the Mille Lacs Band of Chippewa Indians as a municipality for purposes of determining their liability in this action. Insofar as the Plaintiffs' claims relate to the Mille Lacs Band of Chippewa Indians, it is clear that they can not sustain their action. It is well settled that, under *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory" [emphasis in the original]. Of course, the governmental entity may be held liable, under Section 1983, if the execution of its policy, or custom, resulted in a deprivation of a constitutional right. *Id.* at 694, 98 S.Ct. 2018; see also, *McMillian v. Monroe County*, 520 U.S. 781, 783, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)(determining that a County is liable, under Section 1983, for the actions of its Sheriff which constitute County policy); *Yellow Horse v. Pennington County*, 225 F.3d 923, 928 (8th Cir.2000)("[A] municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality"); *McGautha v. Jackson County*, 36 F.3d 53, 56 (8th Cir.1994)("Respondeat superior does not apply under section 1983 because municipal liability is limited to conduct for which the municipality is itself actually responsible.").

Here, however, the Plaintiffs' Complaint is devoid of any allegation that a policy or custom, of the Mille Lacs Band of Chippewa Indians, caused the Plaintiffs' injuries, nor have the Plaintiffs proffered any evidence of such a policy or custom.[9] Thus, it is clear that their causes of action, against the Mille Lacs Band of Chippewa Indians, cannot survive, and we grant the Band's Motion for Summary Judgment on the Plaintiffs' Section 1983 claims.

b. *The Mille Lacs Tribal Police Department.* In addition to the Mille Lacs Band of Chippewa Indians, and Gabiger, the Plaintiffs' have also sued the

---

9. There appears to have been, at one point, some suggestion, by Lawrence, that the Mille Lacs Tribal Police Department was illegally created. *Deposition of William Joseph Lawrence*, at 21, *Ex. B to Second Transmittal Affidavit of Craig D. Greenberg, Esq.* ("I have some question about whether [the Bands have the discretion to create a tribal police department]," as "I'm not entirely clear that they have authority, but they have—you know, I have some questions I guess on that."). There is no further exploration of that issue, and there is no further intimation that the Complaint contains any allegation that the Tribal Police Department was illegally created. Therefore, such an allegation cannot form the basis for liability against the Mille Lacs Band of Chippewa Indians.

The Complaint also appears to contain an allegation that Gabiger arrested Armstrong at the direction of the "tribe." See, *Complaint*, at & 11. By "tribe," we presume that the Plaintiffs meant the Mille Lacs Band of Chippewa Indians, and not the MCT, which is not a Defendant in this action. Of course, if the Mille Lacs Band of Chippewa Indians did order the arrest of Armstrong, without a showing of probable cause, it could be liable for its own constitutional wrong. Nonetheless, there is no evidence connecting the Mille Lacs Band of Chippewa Indians with the arrest of Armstrong, other than its employment of Gabiger. Rather, Gabiger testified that he arrested Armstrong because Deschampe, who is not a member of the Mille Lacs Band of Chippewa Indians, picked Armstrong out of the crowd, and asked him questions. *Gabiger Depo.*, at 33, 39.

Mille Lacs Tribal Police Department under Section 1983. The Tribal Police Department is not a separate legal entity, however, and its liability is the same as the municipality—in this case, the Mille Lacs Band of Chippewa Indians. See, e.g., *Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 807 (8th Cir.1994)(" 'For the [Police] Department to be liable under § 1983 for a constitutional violation, a claimant must show that the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the Department] or that a constitutional deprivation [was] visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.' "), quoting *Marchant v. City of Little Rock,* 741 F.2d 201 (8th Cir.1984); *In re Scott County Master Docket,* 672 F.Supp. 1152, 1163 n. 1 (D.Minn.1987). Thus, as we have already determined that there is no allegation that a policy or custom deprived the Plaintiffs' of their constitutional rights, we similarly grant the Motion of the Mille Lacs Tribal Police Department for Summary Judgment.

c. *Officer Marc Gabiger.* As we have noted, the entirety of this case revolves around the arrest of Armstrong, by Gabiger.[10] The Tribal Defendants argue that Gabiger should be granted Summary Judgment, as he either had probable cause to arrest Armstrong, or he was protected

by qualified immunity. As the two questions are related, we address them jointly.

■■■ Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights, of which a reasonable person would have known. See, *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Young v. Harrison,* 284 F.3d 863, 866 (8th Cir.2002); *Winters v. Adams,* 254 F.3d 758, 766 (8th Cir.2001). In order "[t]o withstand a claim of qualified immunity at the summary judgment stage, a plaintiff must assert a violation of constitutional or statutory right; that right must have been clearly established at the time of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issue of material fact as to whether a reasonable officer would have known that alleged action indeed violated that right." *Mettler v. Whitledge,* 165 F.3d 1197, 1202 (8th Cir.1999); see also, *Young v. Harrison,* supra at 866–67.

■■■ "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." *Wilson v. Layne,* supra at 614, 119 S.Ct. 1692. The contours of the constitutional right at issue "must be suffi-

---

**10.** Although Gabiger is sued in both his individual and official capacities, see, *Complaint,* at & 11, under Section 1983, a suit against an officer in his official capacity is construed as a suit against the governmental entity—in this case, against the Mille Lacs Band of Chippewa Indians. See, *Reehten v. Buck,* 163 F.3d 602, 1998 WL 738329 at *1 (8th Cir. Oct. 23, 1998)("[The plaintiff's] official-capacity action against the three defendants amounts to an action against their municipal employer, St.

Louis County.")[Table Decision]; *Doe v. Washington County,* 150 F.3d 920, 923 (8th Cir.1998)("A suit against a county official in his official capacity is the equivalent of a suit against the county itself."). As such, the official capacity claims, which have been asserted against Gabiger, fail for the same reasons as the claims against the Mille Lacs Band of Chippewa Indians, and the Mille Lacs Tribal Police Department.

ciently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of preexisting law, the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.' " *Bagby v. Brondhaver,* 98 F.3d 1096, 1098 (8th Cir.1996).

 Here, the "clearly established constitutional right," upon which the Plaintiffs rely, is the right not to be arrested without probable cause. Regardless of whether the right was clearly established, however, if Gabiger had probable cause to arrest Armstrong, then there is no basis for the Plaintiffs' constitutional claims. See, *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."); see also, *Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir.1996)("[I]f the police officers had probable cause to believe that Habiger was violating the TRO by yelling or screaming so as to substantially interfere with the provision of medical services * * *, his arrest was valid and would not violate either the Fourth or the First Amendment."). Thereafter, if we must reach the issue of qualified immunity, it is clear that the right to be arrested, only upon a showing of probable cause, was clearly established at the time of the incident at issue. See, e.g., *Habiger v. City of Fargo,* supra at 295 ("Habiger had a clear-

ly established right under the Fourth Amendment not to be arrested unless there was probable cause for his arrest."). For purposes of qualified immunity, however, " '[t]he issue * * * is not probable cause in fact but arguable probable cause[.]' " *Id.,* quoting *Myers v. Morris,* 810 F.2d 1437, 1455 (8th Cir.1987); see also, *Kuehl v. Burtis,* 173 F.3d 646, 649 (8th Cir.1999)("[L]aw enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so—provided that the mistake is objectively reasonable.").

██ "Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *United States v. Taylor,* 106 F.3d 801, 803 (8th Cir.1997), quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); see also, *Kiser v. Huron,* 219 F.3d 814, 816 (8th Cir.2000)("Furthermore, '[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.' "), quoting *Olinger v. Larson,* 134 F.3d 1362, 1366 (8th Cir.1998); *Tokar v. Bowersox,* 198 F.3d 1039, 1046–47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the

suspect had committed or was committing an offense.").

■■■ " 'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.' " *Tokar v. Bowersox,* supra at 1047, quoting *United States v. Everroad,* 704 F.2d 403, 406 (8th Cir.1983). We must keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity." *Id.* Of course, in assessing whether Gabiger had probable cause to arrest Armstrong, we must not only consider the evidence that supports a finding of probable cause, but that which does not. As our Court of Appeals has stated:

> We must give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstance," * * * but such latitude is not without limits. First, because the *totality* of the circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial

inculpatory evidence (standing by itself) suggests that probable cause exists.

*Kuehl v. Burtis,* supra at 650 [emphasis in the original][citations omitted]. In the same sense, "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as 'law enforcement would not [be] unduly hampered * * * if the agents wait[ ] to obtain facts before seeking to arrest.' " *Id.* [citations omitted].

■■■ Reviewing the largely undisputed facts in this case,[11] when viewed from the stance of a reasonably prudent police officer, we conclude that Gabiger had probable cause to arres"t Armstrong on October 22, 1997, or, at the very least, his determination, that he had probable cause, even if mistaken, was objectively reasonable. Therefore, Gabiger is entitled to qualified immunity. The facts show that Armstrong was invited to a meeting of the TEC at the Grand Casino, *Armstrong Depo.,* at 32, and that the meeting room was rented by the MCT for the TEC meeting, *Ex. 1,* a fact which Gabiger knew, although he had not viewed the actual rental documents, *Gabiger Depo.,* at 54–55. Gabiger also believed that Deschampe was the ultimate authority at the meeting, *id.* at 35–36, and,

11. The Plaintiffs would have us conclude that, since Deschampe has testified, that he did not speak with Armstrong at the meeting on October 22, 1997, see, *Deschampe Depo.,* at 44, we must assume that his testimony is true, as it is most favorable to the Plaintiffs' position. Nonetheless, both Gabiger and, more importantly, Armstrong, testified that Deschampe did ask Armstrong about his Native American status, and then asked Armstrong to leave the room, prior to Gabiger's interaction with Armstrong. *Gabiger Depo.,* at 33; *Armstrong Depo.,* at 33–34. It would be a subversion of the Summary Judgment standard to allow the Plaintiffs to argue, for purposes of this Motion, that Deschampe did not speak to Arm-

strong, prior to Gabiger's contact with Armstrong, while they would not be able to argue the same at the Trial of this case, since Armstrong has already averred, by deposition testimony, that Deschampe did indeed have such an interaction with him. *Armstrong Depo.,* at 33–34.

The Plaintiffs also point to discrepancies between Gabiger's deposition testimony, and his official report on the incident, to claim that Summary Judgment is not appropriate given the conflict in the facts. These discrepancies are minor—that is, they are not "material" to the issues before us—and, consequently, they do deter the entry of Summary Judgment.

indeed, since Deschampe was the MCT president at the time, it was his duty to chair the TEC meetings, *Deschampe Depo.*, at 8. Prior to the start of the meeting, Deschampe asked all non-Indians, reporters, and attorneys, to leave the room, as there was to be a discussion about tribe legal issues. *Id.* at 42–44; *Gabiger Depo.*, at 27–28, 31. Armstrong was either not in the meeting room at the time Deschampe made this announcement, or he otherwise did not hear it. *Armstrong Depo.*, at 33. Armstrong was then approached by Deschampe, who asked if Armstrong was a Native American. *Id.* at 33; *Gabiger Depo.*, at 33. Armstrong reportedly replied that his Native American status was none of Deschampe's business. *Armstrong Depo.*, at 33; *Gabiger Depo.*, at 33 (recalling that Armstrong gave a "negative" response). Deschampe then asked Armstrong to leave the room. *Armstrong Depo.*, at 34; *Gabiger Depo.*, at 33. Armstrong reportedly told Deschampe that he would not leave voluntarily because he was not going to comply with the illegal request. *Armstrong Depo.*, at 34.

When Armstrong made no move to leave the room, Gabiger approached Armstrong, and advised him that he needed to leave the room or he would be arrested. *Gabiger Depo.*, at 34–35; *Armstrong Depo.*, at 34–35. Again, Armstrong did not move to leave the room, and he was, as a result, escorted out of the room by Gabiger,

where he was arrested. *Gabiger Depo.*, at 37. Armstrong voluntarily left with Gabiger, and put up no resistence at any time prior to, or during, his arrest. *Gabiger Depo.*, at 37–38.

 Given these facts, it is clear that, while Armstrong may have been invited to the meeting, he was asked to leave by the person that Gabiger knew was in charge of the meeting, and in charge of the governing body which had rented the room, and that Armstrong failed to leave after being given the chance to do so by both Deschampe, and Gabiger. As such, we conclude that there was probable cause for Gabiger to believe that Armstrong was intentionally Atrespass[ing] on the premises of another and, without claim of right, refus[ing] to depart from the premises on demand of the lawful possessor * * *. *Minnesota Statutes Section 609.605, subdivision 1(b)(3).*[12]

 It is true, as urged by the Plaintiffs, that Gabiger did not know whether Deschampe had the authority to ask all non-Indians, reporters, and attorneys, to leave the room, and that he did not question, or investigate, whether Deschampe had such authority. *Gabiger Depo.*, at 35, 79–80. He further did not ask Deschampe, Armstrong, or anyone else at the meeting, the reason for Armstrong's presence at the meeting. *Id.* at 38–39. Thus, they argue that, if Gabiger would have

12. The Plaintiffs also argue that Gabiger's decision to arrest Armstrong, rather than issue him a citation for the violation, violated the Plaintiffs' constitutional rights. This argument is without merit. Under Minnesota Law, an officer has the authority to either arrest an individual charged with a misdemeanor, or issue him a citation. See, *Rule 6.01, Subdivision 1, Minnesota Rules of Criminal Procedure.* The normal procedure for a misdemeanor is to issue a citation, "unless it reasonably appears to the officer that arrest or detention is necessary to prevent bodily harm to the accused or another or further criminal conduct." *Id.* Although Gabiger did testify that it was his normal procedure to arrest for trespassing, *Gabiger Depo.*, at 44, he also stated that he was concerned that Armstrong would repeat the illegal action by attempting to return to the meeting room. *Id.* at 51. Given Armstrong's professed belief, that the order to leave the meeting was illegal, *Armstrong Depo.*, at 34, we conclude that Gabiger's conclusion was reasonable, and that the decision to arrest, rather than to issue a citation, was appropriately within his discretion.

taken the time to investigate the situation, he would have learned that Armstrong had a "claim of right" to be at the meeting, and that the arrest was, therefore, not based upon probable case. For this proposition, they cite *Kuehl v. Burtis*, supra.

The facts in *Kuehl*, however, are starkly different from those presented here. There, the owner of a store, Kuehl, got into an altercation with a customer. *Id.* at 648. While the customer was in the store, Kuehl became frightened that the customer was going to assault her, and she attempted to call the police. *Id.* In her attempt to reach the phone, Kuehl asserts that she accidentally hit the customer in the face. *Id.* Thereafter, the customer punched Kuehl. *Id.* Security guards later restrained the customer, and called the police. *Id.* Once the police were dispatched to the store, an officer interviewed the customer, and the three individuals who had been with him, as well as an employee of the store, and two shoppers. *Id.* All of these individuals stated that Kuehl·struck the customer, although the employee tried to retract her statement. *Id.* The employee's retraction was not contained in the police report. *Id.* The officer did observed very slight bruising on the customer's face.

Kuehl explained that she had accidentally hit the customer in the face when she had attempted to reach the phone, and she, apparently, did have pronounced bruising

on her face. *Id.* Nonetheless, the officer refused to speak with her further, and her version of the events were left out of the police report. Similarly, although another employee, and the only person who witnessed the entire event, attempted to advise the officer about the occurrence, he told the employee that he was not interested in the employee's recitation, and no mention of that employee was contained in the police report. *Id.* Kuehl was arrested for simple assault but, after the charges were dropped, she filed suit, claiming false arrest. *Id.* 649.

The Court affirmed the District Court's decision to deny the officer's Motion for Summary Judgment, noting that the officer "ignored plainly exculpatory evidence," and failed to conduct even the "minimal further investigation" that would have exonerated Kuehl. *Id.* at 651. As the Court explained, "[t]hroughout his investigation, [Officer] Burtis·ignored the circumstances that would have explained why Kuehl struck [the customer] or that would have shown that [the customer's] injuries occurred inadvertently when Kuehl tried to push him away." *Id.* at 648–49.

Clearly, the facts, here, are distinctly different from those presented in *Kuehl*. Armstrong did not ignore any evidence which would have tended to exonerate Armstrong.[13] Moreover, even if he had asked the questions that Armstrong be-

**13.** We note, in particular, that Armstrong does not assert that he informed Gabiger of the specific bases for his present assertion that he had a right to be present during the entire course of the meeting. Nor did he advise Gabiger as to the bases for his assertion that Deschampe had issued an illegal order that he was not obligated to obey. The simple fact is that Armstrong was a visitor to the meeting and, while he had a business, and professional, interest in attending the discussions, it is uncontroverted, in this Record, that the TEC had rented the room for their purposes, that Deschampe was the President

of the TEC, and that Deschampe wanted privacy for the TEC, in order to discuss matters which he regarded as sufficiently sensitive to require privacy. While the salutary purpose in garnering information for public dispersion, in order to advance societies' interests, cannot be questioned as an essential aspect of the free press, that status does not, without more, trump the TEC's legitimate interest in addressing private, legal issues, privately. No where do the Plaintiffs identify legal authority that, notwithstanding the TEC's legitimate interests, Armstrong's status, as a newspaper reporter, supersedes the interests of the TEC.

lieves he should have asked, he would have learned that Armstrong was, in fact, not a Native American, *Armstrong Depo.*, at 19, and that Deschampe believed he had the authority to clear the meeting room of individuals, because the TEC wanted to talk about tribal matters with only Indians persons being present. *Deschampe Depo.*, at 54. While the Plaintiffs believe that Deschampe's order violated the MCT Constitution, which incorporates Robert's Rules of Order, Deschampe specifically testified that he did not believe Robert's Rules applied because the meeting had not been called to order yet. *Id.* at 68–69. Thus, even if a further investigation would have been undertaken, it would not have exonerated Armstrong. See, *Kuehl v. Burtis,* supra at 650.

■ Even though we have concluded, that Gabiger did have probable cause to arrest Armstrong, we also conclude that, even if Deschampe did not have the authority to ask Armstrong to leave the room, Gabiger is still entitled to Summary Judgment on the basis of qualified immunity. Although Armstrong's right not to be arrested, except upon a showing of probable cause, was clearly established at the time of the incident, see, e.g., *Habiger v. City of Fargo,* supra at 295 ("Habiger had a clearly established right under the Fourth Amendment not to be arrested unless there was probable cause for his arrest."), we believe that a reasonably prudent officer, in Gabiger's position, would have believed that he did possess probable cause.

"[L]aw enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so—provided that the mistake is objectively reasonable." *Kuehl v. Burtis,* supra at 649. As already noted, Deschampe, who Gabiger knew as the ultimate authority in the room, had asked all non-Indians,

reporters, and attorneys, to leave the room. He then specifically made the same request of Armstrong. Given the fact that Deschampe believed he had such authority, and it is not absolutely clear that he did not, see, e.g., *Ex. A to Second Transmittal Affidavit of Craig D. Greenberg, Esq.* (opinion of the State District Court, concluding that the question of a "claim of right" in this case is a "unique situation" for the Tribal Court to decide), we cannot expect Gabiger to have been able to discern the legal arguments for both parties, and conclude that Deschampe's perceived authority was in error. As such, in addition to finding that Gabiger had probable cause to arrest Armstrong, and that he was, therefore, entitled to Summary Judgment on the Section 1983 claims, we also conclude that he is entitled to Summary Judgment on the basis of qualified immunity. As such, we grant Gabiger's Motion for Summary Judgment on the constitutional claims. *2. The Plaintiffs State Law claim for defamation.*

■ The Plaintiffs, and in particular Armstrong, claim that they were defamed by the Tribal Defendants action in effecting an arrest of, rather than issuing a citation to, Armstrong, and by arresting him without a showing of probable cause. We have already concluded that there was probable cause for the arrest, however, as well as concluding that Gabiger reasonably decided to arrest Armstrong rather than issue him a citation. Nonetheless, in an effort to be thorough, we will address the Tribal Defendants' argument that, even if there was not probable cause for the arrest, Gabiger is, nonetheless, entitled to official immunity on the State law claim. As a corollary, if he is entitled to official immunity on that claim, then the Mille Lacs Band of Chippewa Indians, and the Mille Lacs Tribal Police Department, may be entitled to vicarious official immunity.

We conclude that both immunity defenses are applicable here.

▮ a. *Official Immunity.* In Minnesota, governmental employees are entitled to immunity when they are performing discretionary functions. See, e.g, *Kuha v. City of Minnetonka,* 176 F.Supp.2d 926, 934 (D.Minn.2001)(applying Minnesota law); *Janklow v. Minnesota Bd. of Examiners,* 552 N.W.2d 711, 715–16 (Minn.1996). As government employees, they are "accorded near complete immunity for their actions in the course of their official duties, so long as they do not exceed the discretion granted them by law." *Janklow v. Minnesota Bd. of Examiners,* supra at 716. Such official immunity is "intended 'to protect public officials from the fear of personal liability that might deter independent action.'" *Dokman v. County of Hennepin,* 637 N.W.2d 286, 296 (Minn.App.2001), rev. denied (Minn., February 28, 2002).

▮ As a result, the heart of our analysis, under a claim of official immunity, is the nature of the governmental action; that is, was the act discretionary or ministerial. "[I]n analyzing any immunity question it is essential to identify the precise governmental conduct at issue." *Watson v. Metropolitan Transit Comm'n,* 553 N.W.2d 406, 415 (Minn.1996). Discretionary decisions are those which involve the exercise of judgment or discretion. See, *Johnson v. Morris,* 453 N.W.2d 31, 41 (Minn.1990); *Mowatt v. Hennepin County,* 2002 WL 857733 at *4 (Minn.App., May 7, 2002) (stating that discretionary acts are those that involve "the exercise of individual judgment in carrying out official duties")[unpublished decision]. In contrast, ministerial decisions, which are the types of decisions that are absolute, certain, and imperative, and involve merely the execution of a specific duty which arises from fixed and designated facts, see, *Rico v. State,* 472 N.W.2d 100, 107 (Minn.

1991), are not immune to suit. "Some degree of judgment and discretion will not necessarily confer discretionary immunity on an official; the crucial focus is upon the nature of the act." *Elwood v. County of Rice,* 423 N.W.2d 671, 677 (Minn.1988).

▮ The categorization of an act as discretionary or ministerial is a legal question, which the Court determines. See, *Kelly v. City of Minneapolis,* 598 N.W.2d 657, 664 (Minn.1999). "In making this determination the Court [should] keep[ ] in mind that official immunity, 'protects public officials from the fear of personal liability that might deter independent action and impair the effective performance of their duties.'" *Kuha v. City of Minnetonka,* supra at 934, quoting *Elwood v. County of Rice,* supra at 677.

▮ Generally, "[a] police officer who performs his or her duty to prevent crime and enforce the law is not * * * acting in a ministerial capacity, but is usually exercising discretion." *Kuha v. City of Minnetonka,* supra at 934; see also, *Watson v. Metropolitan Transit Comm'n,* supra at 415; *Johnson v. Morris,* supra at 41. Rather, "[o]nly when officials act outside the scope of their charged authority can they be deemed to have waived this immunity and be held personally liable for their negligence." *Watson v. Metropolitan Transit Comm'n,* supra at 415. The Court, in *Kuha,* explained the reasoning for such a rule, as follows:

> Official immunity is provided because the community cannot expect police officers to do their duty and then to second-guess them when they attempt to conscientiously do it. To expose police officers to civil liability whenever a third person might be injured would * * * tend to exchange prudent caution for timidity in the already difficult job.

*Kuha v. City of Minnetonka,* supra at 934–35. There can be no question, here, that

Gabiger's actions were discretionary exercises of judgment. He was required to make a determination, from the circumstances facing him, whether there was probable cause to arrest Armstrong, and whether there was a reasonable belief that, if he did not arrest Armstrong, criminal conduct would continue to occur. This is the quintessential discretionary decision that police officers must make routinely.

 The only other question, then, is whether Gabiger acted with malice. In addition to the fact that ministerial decisions are not protected by official immunity, the immunity can also be eviscerated when the plaintiff alleges, and proves, that the official acted willfully and maliciously. See, *Kuha v. City of Minnetonka*, supra at 934, *Kelly v. City of Minneapolis*, supra at 663. The Minnesota Supreme Court has stated that willful, or malicious conduct, is the "intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Kelly v. City of Minneapolis*, supra at 663, quoting *Rico v. State*, supra at 107. Stated otherwise, "[m]alice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." *Id.* at 664. The question of malice is an "objective inquiry into the legal reasonableness of an official's actions." *Dokman v. County of Hennepin*, supra at 296, quoting *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).

Although the Plaintiffs conjure that Gabiger's actions were politically motivated, in an attempt to screen Armstrong from the meeting, there is absolutely no evidence to support that assertion, either circumstantial or direct. Rather, Gabiger made a decision, that probable cause existed to believe that Armstrong was trespassing in the TEC meeting room—a decision which we have already concluded was ob-

jectively reasonable—and then determined that it was necessary to arrest Armstrong rather than issue him a citation. Given Armstrong's determination, that Deschampe's order for him to leave the room was illegal, we have no doubt that Gabiger's conclusion, that Armstrong would have attempted to reenter the meeting room, if he were released, was a reasonable one. As such, we conclude that Gabiger is entitled to official immunity on the Plaintiffs' State law claim.

 b. *Vicarious Official Immunity.* "If a public official is entitled to immunity for a discretionary act, the employing entity is generally entitled to vicarious official immunity as well." *Fear v. ISD 911*, 634 N.W.2d 204, 216 (Minn.App. 2001). As the Minnesota Supreme Court has explained:

When applicable, vicarious official immunity protects the government entity from suit based on the official immunity of its employee. In prior cases, "[g]enerally, if the employee is found to have immunity, the claim against the municipal employer has been dismissed without explanation." *Pletan* [*v. Gaines* ], 494 N.W.2d 38,] 42 [ (Minn.1992) ]. We apply vicarious official immunity when failure to grant it would focus "stifling attention"· on the official's performance "to the serious detriment of that performance." *Olson v. Ramsey County*, 509 N.W.2d 368, 372 (Minn.1993). In such circumstances, we have concluded that "[i]t would be anomalous * * * to impose liability on the [government employer] for the very same acts for which [the employee] receives immunity." *Watson* [*v. Metropolitan Transit Comm'n* ], 553 N.W.2d at 415. We also suggested in dicta, however, that we might under some circumstances find an exception to vicarious official immunity and hold a governmental entity liable

even though the official is not personally liable. *Pletan v. Gaines*, 494 N.W.2d 38, 42 (Minn.1992). * * * [W]e clarify that a grant of vicarious official immunity to a public employer would be based on the nature of an employee's immune conduct, whether or not the employee was actually named as a defendant in a lawsuit.

*Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn.1998). "Whether to apply vicarious official immunity is a policy question" and, in considering police officer decisions, "[t]he need to protect the public must be weighed against the concern that the public not be put at risk." *Kuha v. City of Minnetonka*, supra at 935; see also, *Sletten v. Ramsey County*, 2002 WL 109272 at *1 (Minn.App., January 29, 2002)(stating that the decision to apply vicarious immunity to a governmental entity is a policy question) [unpublished decision].

The Minnesota Supreme Court has applied vicarious official immunity to avoid "the focus of a stifling attention on the [employee's] performance, to the serious detriment of that performance," *Olson v. Ramsey County*, 509 N.W.2d 368, 372 (Minn.1993), and the Minnesota Court of Appeals has applied the immunity when it "serves to avoid chilling the [employee's] exercise of his independent judgment by allowing him to act without fearing that his conduct may eventually be subject to review by the judiciary and may expose his employer to civil liability," *Ireland v. Crow's Nest Yachts, Inc.*, 552 N.W.2d 269, 274 (Minn.App.1996). As such, we believe that public policy dictates that the immunity should be applied here.

■ If we were to hold the Mille Lacs Band of Chippewa Indians, or the Mille Lacs Tribal Police Department, liable for Gabiger's decisions, in the event that the decisions were unlawful, then the subsequent actions of Gabiger, or of other offi-

cers, could be subject to second-guessing by the officer in the field. Such a situation could be exceedingly dangerous in their work as police officers, if not deadly. Accordingly, we believe that, under the facts presented here, such policy considerations support our decision to impart the Mille Lacs Band of Chippewa Indians, and the Mille Lacs Tribal Police Department, with vicarious official immunity for Gabiger's actions. As such, we grant the Tribal Defendants' Motion for Summary Judgment in its entirety.

NOW, THEREFORE, It is—

ORDERED:

That the Tribal Defendants' Motion for Summary Judgment [Docket No. 30] is GRANTED.